Good morning. Tracy Hayes from the Federal Defender's Office in the District of Connecticut on behalf of Mohammed Reza Kamali. May it please the court, the sentence in this case was procedurally unsound. The district court committed procedural error by adding six levels to the base offense level under the guideline 2K2.1A5. In other words, the district court erred as a matter of law in determining the base offense level. Here, the court's legal conclusion that the law. I am basing this on the Supreme Court's decision, which is clear about what intent means with respect to the National Firearms Act. That case is Staple versus the United States, decided in 1994. The Supreme Court has plainly held that it's the defendant's intent, and not anyone else's, that's relevant in this type of case. To obtain a conviction under the NFA, the government in this case should have been required to prove that the defendant here knew of the features of his AR-15 that brought it within the scope of the NFA. The ATF has similarly interpreted the National Firearms Act to focus on the defendant's intent. So again, here, it's the intent. There are several cases- In Staples, Judge Shin, in Staples, was the court concerned about intent or knowledge? In other words, whether the defendant knew that the weapon had the features in question, as opposed to intent as to how it would be used, I mean, does it matter? In Staples, the court was focused on the intent. So in other words, Staples is not interpreting the meaning of intended to be fired from the shoulder. Rather, the court is articulating the appropriate mens rea that must be proven by the government at trial. The opinion says, quote, the government should have been required to prove that petitioner knew of the features of his AR-15 that brought it within the scope of the act. Right. And even if that is the case, that had not been proven here. So we rely on intent because of how this firearm was developed, created, prepared by the defendant. So he intended the firearm, again, to be fired specifically from an arm brace, but not from the shoulder. And even if we were relying on- I mean, this was initially a shoulder brace that had a little bit of it lopped off. Is that true? No, Your Honor, it was not. No, not at all. And so not only was that not true- When you look at the picture, it looks like a rifle from a lay person's point of view. And it's not, Your Honor, because of the definition, right? The length of the definition of a rifle. And so in no way was- This is Judge Park. Isn't that the intent, though? It seems like the intent was to modify the shoulder stock so that it would fall within the definition of rifle, not that it was necessarily supposed to be used, that he was going to use it as a- So with respect to what the court is saying is now termed a shoulder stock, it was never a shoulder stock. It was not even designed to be a shoulder stock. Thus, it was not designed to be fired from the shoulder. This is a factual question? A factual question as to what it was intended for and all that? And didn't the district court here make factual findings? Right. Based on testimony. But it was still speculation. Because what we have, and you could read what would be the agent's testimony. He's saying, I could shoot it from the shoulder. That's fine. But that's not what it was designed for. And it's not as though he shot it from the shoulder. He's saying that to the court at the sentencing. And so even if in relying on the testimony, what I'd ask this court to consider as I did the district court, we, the defense, submitted letters, expert letters, from the National Firearm. I'm sorry, from the ATF, rather. And several letters, as well as other documentation. So we have opinion letters, which explains why this was a firearm and not a rifle, which explains the use of the brace versus the use of what was considered a shoulder brace, as opposed to the full-on brace. I would also ask, this is just Lillie, what was the precise question that you claim the district court needed to answer in connection with this issue? Was it whether or not this firearm constituted a rifle or could constitute a rifle? What was the precise question? Well, yes. Yes. I mean, as this court just stated, yes. And in giving that- Well, if that's true, and there's an ATF agent who says, well, and there's testimony, or an affidavit, however the evidence comes in, that this firearm could constitute a rifle, based on its constituent parts made or remade, then why couldn't the district court rely on that? Notwithstanding other evidence, other contrary evidence. Well, it could have because, again- You have one minute, by the way. Thank you. Again, perhaps I am falling back on something that this court doesn't deem appropriate, but the intention of the designer, right? That brace, that arm brace, not only was it for the forearm, but it had a slot for what would be a Velcro strap. What else are you going to do with that slot or the strap? You're almost out of time. You're almost out of time. And the significant issue is, the district court said she had given it a lot of thought, and that even if the base offense level were 12, she would impose the same sentence anyway. So why? Do we need to resolve the question of whether this was a rifle? I think we do, Your Honor, because we're talking about a base offense level of 18 versus a base offense level of 12. Had, as we believe that we were correct, he was only facing 10 to 16 months. And then we had all of the factors, mitigation, leading up to sentencing, where she had alternatives. The district court had alternatives. But given that- Also had a lot of- Go ahead. You also have a lot of very serious conduct, the sale of six weapons, ghost guns, to someone he thought was a convicted felon. You have him doing things like sending parts to his friend without his friend's permission, offering to sell guns to others, recklessly firing guns in the woods and town zone. You look at all of that, a sentence of 18 months doesn't trouble me at all. Your Honor, this was an 18-year-old man, an 18-year-old boy, frankly. He was 17 initially when some of those events took place. He was 18 at the time of his arrest. So I'd ask the District Court to consider that all of the guns in this case were sold to agents. But given the statement that just Chen mentioned from the district court, would you please explain how any error in the district court's sentencing calculation is not harmless? Your Honor, at the very least, the court would have started at a sentencing guideline range of 10-16 months. And given everything leading up to sentencing, 10 months on the GPS monitoring device, home detention. He was back in college, although he had been kicked out of one college. He was significantly into at least his second or third semester of college. He had done volunteer work. He did not violate at all. I believe that starting from a 10-16 guideline range would have changed the whole landscape of this. And that's why here, I believe that the sentence was procedurally and substantively in error. All right. You have three minutes for rebuttal. We'll hear from the government. Good morning, Your Honor. May it please the court. I'm Lauren Clark on behalf of the United States, and I also represented the United States in the case below. I'll turn to the calculation of the guideline range, and I'll start with the fact that the court was fairly clear that she would have imposed that same 18-month sentence, even if the guideline range were different, were calculated differently. I think she actually went so far as to say that the type of firearm, the fact that it was a short-barreled rifle that increased the guideline was not as relevant to her, not as significant as other factors. And she articulates at A-286 to 287 that it was the circumstances under which he made and sold those firearms and the number that really informed her evaluation of each of the 3553A factors to come to that 18-month sentence. So, I think that even if the court was to hear, was to find that Judge Hall miscalculated the guideline range, it is harmless error. When does that end? In other words, at a certain level, we're told, and we spend a lot of time on these issues of procedural error in connection with the calculation of the guidelines, and yet there seems to be this harmlessness end run where a district court judge can say in many, if not all, cases, you know what, I would have imposed the same sentence. So, regardless of, even if I, the calculation of the guidelines is wrong, when does that end? I mean, Molina, opinion seems to suggest that there's a limit, but in these types of cases, when does that end? Um, let me, hopefully I understand the question. With respect to the court here, I think she actually made a thoughtful decision about that 18-month sentence and acknowledged that it would have been an upward departure from other guideline calculations. And so, if I'm understanding the question correctly, is it the fact that she here articulated not just some boilerplate language to pad, you know, her sentence? The question is sort of a broad question about harmlessness and the circumstances under which a district court judge, a sentencing judge, can avoid these sometimes very thorny issues of procedural error by saying at the end of the day, even if I'm wrong, even if the guidelines were this, I would have imposed the same sentence. Why, you know, that could happen in every case. Um, it could, Your Honor. I suspect it does in many, but I think that's where the defendant's substantively reasonable varies into this evaluation by, you know, the appellate court. It may have been procedurally reasonable, but then there is a question as to whether or not the sentence, notwithstanding any procedural errors, was substantively reasonable. Is it within that range of permissible decisions? So, I do think there is a little bit of a safeguard there if you're able to look at it from both perspectives, which was raised by Mr. Kamali here and which the court is hearing. You're saying that if a sentence turned out to be substantively unreasonable, the district court couldn't salvage it by saying I would have, you know, reached the same result anyway. That's kind of what you're saying, I think. I think so. I think so. I think the court rightfully considers both. And I think the court did that here. I think the court was very, the district court was very cognizant that if she gave an 18-month sentence, that at that lower guideline range, she would be departing upward by two levels. Sorry, two months. He got 18 months. It would have been a 16-month top of that guideline range. But then I think looking substantively at the substantive reasonableness of this sentence, I think as the court articulated earlier, I mean, we're talking about numerous homemade rifles being sold to someone who he thought was a felon in a motorcycle gang who was then reselling these firearms. And this was all before the district court. And all of a sudden, 18 months is not shockingly high for this conduct. I wonder if there's an error in the statement of reasons. I noticed the statement of reasons says that the guideline range was 37 to 46 months, which is different from what the parties were saying at the sentencing. Your Honor, I believe that that 37 to 46 was the probation officer's calculation. The district court granted a Fernandez departure for the plea agreement. Right. No, but I'm just saying that's in the statement of reasons. That's an error, right? Because that's what was in the PSR, not what the district court found. I'm just trying to clarify that. That's correct. Yes. The court found the applicable guideline range to be 24 to 30 months. Why don't you address the merits in case we reach it? As to the procedural? Whether it's a machine gun, yes, or intended to be a machine gun or, yeah. A rifle. I think that Attorney Hayes really- Not a machine gun, a rifle. Yes, a rifle, I mean. Right. It oversimplifies the fact whether it's intended to be fired from the shoulder as simply being Mr. Kamali's intent for the firearm. I think the district court did a very fulsome job and even reviewed Genova. You could find that when you look at intended to be fired from the shoulder as appears in the statute, which the firearm must be to get this enhancement, there's the issue of plain language, what language is used, whose intent matters. The district court had a back and forth with Attorney Hayes about whose intent, whose intent, because the statute's silent on whose intent matters. The court recognized that and acknowledged that. It then turned to the congressional history, which was equally important to determining whether Mr. Kamali's intent for this firearm mattered. The government went through and summarized the history of the statutory amendments. Essentially, the NSA was amended to prevent someone from cutting off that shoulder stock to claim that it was no longer intended to be fired from the shoulder. I think the court recognized that at GA-147 and then it's briefed at GA-109 and 110. The court was aware of that and acknowledged that in its findings. The court also recognized that there was very limited case law on this, this interpretation of intended to be fired from the shoulder. It's not in Staples. Staples talks generally about mens rea, but it doesn't interpret intended to be fired from the shoulder. You're not, this is just Lilia, you're not suggesting that subjective intent is irrelevant, are you? I, with respect to intended to be fired from the shoulder, I think it is an objective standard. I think the case law says it's an objective standard. As you stated in your brief, the ATF explained that the question of whether a firearm was designed or made into a firearm under the NFA involves both objective and subjective analyses. So, in addition to conducting an objective analysis, shouldn't we also consider the user's subjective intent? Well, ATF as a regulator, I think is not one, it might not be. Well, no, no, no. So, you're using the, you can't use the ATF both as a sword and as a shield. So, the ATF, that's their view. And so, why in addition to conducting an objective analysis, why should we follow that view and also consider the user's, you know, Mr. Kamali's subjective intent? I think the court can. And I think the district court did consider Mr. Kamali's subjective intent, but also considered the objective intent for the firearm. I think in the specific instance when the ATF discusses it is in one of the letters presented by Mr. Kamali, what ATF is talking about is taking a totally lawful firearm and using it in an unlawful manner. So, a perfectly legal firearm raised up to someone's shoulder, the ATF thought that this actually could create a short barreled rifle. So, what it was doing was saying, look, if you're trying to use something illegal illegally, then we should consider subjective intent for the purpose of our regulations. I don't know if the same thing is applicable here where you have something that is essentially patently illegal, objectively illegal, but the person promises, oh, I'm only going to use it in a legal way. I'm not going to put it up to my shoulder. So, I think there might be a distinction with respect to ATF. I think the court acknowledged ATF had an objective and a subjective approach to it, but I think the court looked and focused on the congressional intent and the plain language of the statute to find that intended to be fired from the shoulder was very much an objective standard. All right. Thank you. We'll hear the rebuttal. Thank you. I want to first respond to just to make sure that we're clear. The firearm was made lawfully in the sense that it was lawful. It was a firearm. It was not a rifle. It was never made to be shot from the shoulder. And we use the term, it's a shoulder stock and a forearm brace. So, I do want to point that out. I think it's also important to point out that the district court substituted an objective reasonableness standard in lieu of the NFA's narrow mens rare requirement. So, for example, the district court hung the question of intent on whether or not the weapon looked comfortable being held at the shoulder or by the firearm. This is Judge Park. Your client called it a rifle a couple times. What do we do with that? Doesn't that reflect some intent? Your Honor, thank you. My client at the time, again, he's 18 years old. He is frankly a child. He was under the influence of alcohol. The court may recall he had abused and he was addicted to alcohol from an early age. And so, he was abusing alcohol and he also had behavioral health issues. So, this was, if anything, a slip of the tongue more than what he was relying on, this is a rifle. He did not mean to say that. In fact, if we go on to some of the other either text messages or some of the other videos between the agent and Mr. Kamali, you can see that he's saying, not only am I making this to be shot from your forearm, giving you a forearm brace with the Velcro, with the slot and all, but I'm also going to give you papers from the ATF which shows and proves that this is not a rifle and this should be shot. It's legal and it should be shot from your forearm. So, when he says that, he misspoke. It was a slip of the tongue from him. And, you know, this is just Lilia, just parts questions present in part. The problem with using subjective intent is a problem of self-incrimination potentially, right? So, somebody mistakenly refers to a firearm as a rifle in an incriminating way and that becomes, if it's a subjective intent issue, a self-incriminatory statement. If it's not, then it's irrelevant. So, you know, when you go down this road, I think, that you're going down of insisting that there's a subjective intent element to this, you really start to bump into a number of issues involving the Fifth Amendment and self-incrimination. You have one minute. So, thank you. So, remember, he's thinking he's talking to just somebody purchasing this firearm. Even if it was self-incriminating, he just says a rifle and then clarifies it. And I'd ask the court, again, to consider he was under the influence, he was 18 years old, and he had behavioral health issues. He then goes on to clarify that it was raced and what it was made for, what it was designed for, and it was made to be shot from the forearm. Even if we look at this self-incrimination, I'd ask the court to consider some of the other discussion between him and the agent. And you could see, he's a child, right? And so, he's saying things that are boastful, he's doing those things. But here, specifically, he'd only called it a rifle once. And he made that mistake once, but then he cleaned it up, clarified it, and informed the agent that it was a forearm brace and not to be shot from the shoulder. And with that, I thank you. Thank you. Thank you both. We will reserve decision.